In the Matter of the Estate of ADELAIDE L. SMITH, Deceased.

Surrogate's Court, Kings County, November 21, 1941.

*Louis Fieldman,* for Charles M. Smith, as executor, etc., appellant.

*Harry M. Peyser* [*Edward Devlin* of counsel], for the New York State Tax Commission, respondent.

WINGATE, S. This is an appeal from a determination by the estate tax appraiser that certain bank accounts in Totten trust form are properly to be included in the gross assets of this estate. The relevant facts are not controverted.

At the time of his death on July 4, 1934, the nearest relatives of Charles M. Smith, the elder, were his son, Charles M. Smith, Jr., a daughter, Mabel Graessle, and a sister, Adelaide L. Smith, who is the present decedent.

It seems apparent that all were familiar with the devolutionary opportunities open under section 239 (formerly section 249) of the Banking Law and pursuant to the doctrine of *Matter of Totten* (179 N. Y. 112, 125), since the estate tax schedules in his estate disclosed two accounts (Williamsburgh Savings Bank, No. 78,840, and Seamen's Savings Bank, No. 855,052) standing jointly in his name and that of his sister, and four Totten trust accounts, one each for his son and daughter, and two (Williamsburgh Savings Bank, No. 85,846, and Seamen's Savings Bank, No. 878,481) for his sister.

It may be noted in passing that at the time of his death there were also in existence three Totten trust accounts (Brevoort Savings Bank, No. 115,811; Seamen's Savings Bank, No. 855,034, and Bowery Savings Bank, No. 1,443,475) which had been opened by his sister, the present decedent, in trust for him.

Shortly after his death, this sister informed her nephew " that she was turning over to him the moneys which she received from " his " father through the joint accounts and the accounts in trust for her, as well as her own moneys *except so much as she deemed necessary for a reserve for her own living expenses* but that in order to prevent " him " from squandering the money she would place it in the form of deposits in trust for him so that he would be compelled to come to her whenever he wished to make withdrawals." (Italics supplied.)

Counsel for the State Tax Commission has seized upon the italicized words in the foregoing quotation as indicative of an intention on the part of the decedent to subject the transfer for the benefit of the nephew to a condition that the subject-matter was to be available for use for her own future needs. The court is unable to concur in this interpretation. As it views the matter, she indicated an intention of presently " turning over to him " moneys of three varieties, namely, *first*, the proceeds of the joint accounts with his father; *second*, the proceeds of the Totten trust accounts which she had received from his father; and, *third*, funds of her own in excess of those necessary for her own use, " except so much as she deemed necessary for a reserve for her own living expenses."

Her conduct in furtherance of her stated intentions is consonant only with this interpretation. She opened Dime Savings Bank account No. 980,008 in her name in trust for her nephew with the proceeds of the joint account which had been in the Seamen's Savings Bank in account No. 855,052. She opened the Williamsburgh Savings account No. 112,804 (subsequently renumbered 157,882) with the funds from the joint account in the same bank, No. 78,840. The Totten trust account of the deceased for her which had been carried in the Williamsburgh Savings Bank under account No. 85,846 was continued under the same number with a mere alteration of the name of the account from the decedent in trust for her to her in trust for her nephew until 1938, when its number was changed to 159,902 without any loss of continuity. Finally, in this connection, the avails of the other Totten trust for her benefit (No. 878,481 in the Seamen's Savings Bank) were transferred intact to Seamen's account No. 855,034, which had previously stood in her own name in trust for her deceased brother. The legend of this was simultaneously changed from her name in trust for her brother to her name in trust for her nephew. This completed her acts in fulfillment of her announced intentions of turning over to her nephew the sums which had come to her from her brother, so far as the bank accounts received from him were concerned.

There remain for consideration the acts performed by her at that time in furtherance of her expressed design to turn over to her nephew so much of her own funds as she considered unnecessary of retention as a reserve to meet her future needs. As has already been noted, prior to the death of her brother, she had maintained three accounts in her name in trust for him. These were Brevoort account No. 115,811, Seamen's account No. 855,034 and Bowery account No. 1,443,475. The avails of the Brevoort account were used to open an account (No. 185,337) in the same bank in the name of this decedent in trust for her nephew. Those in the Seamen's Savings Bank account after increase by the sums from her brother's Totten trust account in the same institution (No. 878,481), as hereinbefore noted, were transferred intact to a new Seamen's Bank account, numbered 936,817; and the balance in the Bowery account was used, without alteration, to open account No. 1,628,164 in the same institution in the name of this decedent in trust for her nephew. In other words, the sum total of the transfers of the decedent at this time from her own funds, as distinguished from those which she had received from her nephew's father, comprised merely the sums which she had previously set aside in the trusts for that father prior to the death of the latter.

That in transferring the funds of this third class to her nephew she did not underestimate the sums " necessary for a reserve for

her own living expenses " is demonstrated by the fact that although she made additional transfers between July 7, 1937, and January 4, 1940, aggregating $9,295, her debts on death totaled only $836.44, whereas her securities, bank accounts (other than those here in question) and other property were worth $33,520.81 according to the figures of this appraisal.

The interesting feature of all of the transfers by this decedent, both those hereinbefore discussed and the two remaining for consideration, is not that in each case she opened these accounts in her name in trust for the intended beneficiary and continued them under that legend until her death, but that in each instance she immediately delivered the bank books to the respective beneficiaries, that they remained continuously in their possessions until her death and that they paid, from their own funds, the income taxes upon the interest additions which were annually credited upon the accounts. There were, to be sure, certain withdrawals from some of these accounts during the interval between their opening and the date of the decedent's death, but the demonstration is uncontroverted that on each such occasion the withdrawal was accomplished by the joint action of the decedent and the beneficiary, both attending at the bank, where the decedent executed a withdrawal slip and the beneficiary produced the book to permit of the withdrawal. On each occasion, furthermore, when the money was received, it came into the possession of the beneficiary. This procedure was obviously in furtherance of the plan of the testatrix as initially explained that although " she was turning over * * * the moneys " to the beneficiary, yet " in order to prevent " him from squandering it " she would place it in the form of deposits in trust for him so that he would be compelled to come to her whenever he wished to make withdrawals."

Two accounts in addition to those hereinbefore discussed are involved in this proceeding. The first (Brevoort No. 196,494) was opened by the decedent on July 7, 1937, in her own name in trust for her niece, Mabel Graessle, and the second (Kings County, No. 73,344) on December 30, 1937, in her own name in trust for her nephew. The funds used for this purpose were the individual unearmarked moneys of the decedent, but aside from this circumstance, the procedure adopted was identical with that in respect of the accounts previously considered. The books were given to the beneficiaries and thereafter remained continuously in their respective possessions. No withdrawals were made from the account for the nephew. A single withdrawal of fifty dollars was made from that of the niece, but the money was received by her to pay for some desired house furnishings and the book returned to her.

The much-quoted rule respecting the effect of transactions of the variety here disclosed, as announced in *Matter of Totten (supra,* 125), reads: "A deposit by one person of his own money, in his own name as trustee for another, standing alone, does not establish an irrevocable trust during the lifetime of the depositor. It is a tentative trust merely, revocable at will, *until the depositor dies or completes the gift in his lifetime by some unequivocal act or declaration, such as delivery of the pass book or notice to the beneficiary.*" (Italics supplied.)

In its rather more than passing review of the Totten rule and the decisions which gave rise to it, contained in *Matter of Vaughan* (145 Misc. 332), this court concluded that the tentative rights of the presumptive beneficiary of such a trust "*may be turned into vested present rights during the lifetime of the depositor, if the latter completes the gift in his lifetime either by acts sufficient to constitute a valid gift inter vivos, or to effect the erection of a present trust.*" (*Matter of Vaughan, supra,* 338. See, also, Butler, N. Y. Surr. Law & Prac. § 1376.)

The decisions since *Matter of Totten* have been substantially uniform in the application of these principles. Thus it has not only been held that delivery of the bank book to the *cestui que trust* named in the account accomplished an indefeasible vesting of the avails in him (*Stockert* v. *Dry Dock Savings Institution,* 155 App. Div. 123, 128; *Larkin* v. *Greenwich Savings Bank,* 241 id. 874, 875; 244 id. 756; affd. 271 N. Y. 569; *Matter of Rudolph,* 92 Misc. 347, 348; *Matter of Reynolds,* 163 N. Y. Supp. 803, 811, not otherwise reported), but the same result has been reached where it was demonstrated that unequivocal notice had been given to the beneficiary by the depositor that the trust had been created for his benefit. (*Matter of Davis,* 119 App. Div. 35, 36; *Matter of Pierce,* 132 id. 465, 468; *Matthews* v. *Brooklyn Savings Bank,* 151 id. 527; *Matter of Reed,* 89 Misc. 632, 637; *Matter of Brennan,* 92 id. 423, 424; *Matter of Wille,* 111 id. 61, 65.) A majority of these cases involved the issue of taxability of such accounts and the uniform determination has been that they were not taxable.

As disclosed by the present record, a stronger case for a determination of absolute vesting of the accounts in the respective beneficiaries has been made out than was disclosed in any of those cited. Not only were the beneficiaries notified of the establishment of the trusts and the indicia of ownership given to and continuously retained by them, but all withdrawals from the accounts came into their possession and they personally paid the income tax due by reason of the accruing interest on the accounts.

In view of this situation, the appraiser erred in including these accounts in the gross estate for tax purposes and the appeal will be sustained.

Enter order on notice in conformity herewith.